# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                            No. CR 04-2019 JB

RICARDO CORRAL-ALVAREZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court for sentencing on February 16, 2005.  The primary issue is whether the Court should sentence Defendant Ricardo Corral-Alvarez to time served or to give him further incarceration, as the United States Sentencing Guidelines ("U.S.S.G.") would suggest.  See Defendant's Sentencing Memorandum, filed February 8, 2005 (Doc. 19).  Because the Court concludes that the punishment set forth in the Guidelines is appropriate for Corral-Alvarez' offense, the Court will impose a sentence that is consistent with and within the Guidelines.

## FACTUAL BACKGROUND

Corral-Alvarez' alias is Alfredo Reyes.  Corral-Alvarez, a thirty-two-year old man, is a citizen of Mexico, and is an illegal alien in the United States.  See Presentence Investigation Report ("PSR") at 1 (disclosed December 22, 2004).[1]  Corral-Alvarez has a ninth grade education.  See id. at 1; id. ¶ 31, at 8.  Corral-Alvarez indicated that his family was very poor when he was a child; however, all

---

[1] The parties did not object to the PSR.  See Transcript of Hearing at 3:10-14 (taken February 8, 2005).  The Court adopted the PSR as its factual findings.  See id. at 9:9-11.

The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

of his needs were met.  See id. ¶ 25, at 7.

Corral-Alvarez' legal address is Aurora, Colorado.  See id. at 1.  He reported the following residential history:  from 1997 to 2004, he resided in Aurora, Colorado; from 1991 to 1997, he resided in Los Angeles, California; and for the rest of his life, he resided in Quiroga, Michoacan, Mexico.  See id. ¶ 26, at 7.

On March 21, 1997, Corral-Alvarez was arrested and originally charged with Driving Without a Valid License (Count 2), which was dismissed.  See State v. Corral-Alvarez, Case No. 97T201954 (Arapahoe County Court, Aurora, Colorado, July 10, 1997); PSR ¶ 21, at 4.  He was convicted on Count 1: Operating Vehicle Without Insurance.  See id. ¶ 21, at 4.  On July 10, 1997, Corral-Alvarez pled guilty and was sentenced to $100.00 fine, $90.00 suspended; 40 hours community service, suspended; and costs.  See id.  Probation gave him no criminal history points for this conviction because, under U.S.S.G. § 4A1.2(c), it is an excluded offense.  See PSR ¶ 21, at 4.

On October 9, 1998, at the age of 26, Corral-Alvarez was again arrested and charged with: (i) Count I: Sexual Assault on a Child (felony); and (ii) Count II: Third Degree Assault (misdemeanor).  See id. ¶ 22, at 4-7.  Corral-Alvarez pled guilty to both counts.  See State v. Corral-Alvarez, Case No. 98CR2524 (County District Court, Brighton, Colorado, December 3, 1998); PSR ¶ 22, at 4.  Counsel represented Corral-Alvarez.  See id. ¶ 22, at 6.  According to the Aurora, Colorado, Police Department's Affidavit of Probable Cause for an Arrest Warrant, on October 7, 1998, at 8:12 p.m., a uniformed officer on patrol noticed an individual, later identified as Angela, move from the middle of a car parked in an empty field to the passenger's side and also slid down in her seat.  See id. at 6. The officer observed two people in the vehicle.  See id.  When the officer approached the driver's side of the vehicle, the officer saw, among other things, that the passenger

-2-

was a juvenile, and he believed that a sexual encounter had occurred or was about to occur.  See id.  The officer questioned Corral-Alvarez and learned that he did not have identification with him.  See id.  The officer had Angela exit the vehicle and learned she was only twelve-years old.  See id.  Based on this information, the officer placed Corral-Alvarez under arrest for investigation of a sexual assault on a child.  See id.  An officer located a used condom outside the driver's side door of the vehicle.  See id.

Corral-Alvarez stated that he saw Angela walking down the street in the area of E. 25th Ave. and Dayton St., and he learned that she needed a ride home.  See id.  Corral-Alvarez discovered that Angela was very upset because she had just broken up with her boyfriend.  See id.  Corral-Alvarez thought that Angela was fourteen-years old.  See id.  Corral-Alvarez indicated that, although he was married,[2] he took off his shirt and shoes, and then Angela helped him unzip his pants.  See id.  Corral-Alvarez produced a condom, which he had in his car, and Angela helped him put it on.  See id.  Angela then removed her shorts, and they both moved to the middle of the car.  See id.  Corral-Alvarez attempted to put his penis inside of Angela's vagina.  See id.  Corral-Alvarez was unsure if he had placed his penis inside of Angela's vagina, but he was sure that he put it underneath her underwear.  See id.

Angela stated that she had been walking down the street with two female friends, and Corral-Alvarez pulled up next to the girls and asked Angela where she was going.  See id.  Angela replied that she was going home.  See id.  Corral-Alvarez then said: "No, you come with me for sex."  Id.  Angela got into the car with Corral-Alvarez, and they proceeded to drive to a 7-11 store where

_____

[2] The PSR indicates that Corral-Alvarez was married at the time he committed this offense.  See PSR ¶ 22, at 6.  The PSR states that, in 2004, Corral-Alvarez married Veronica Garcia, but does not indicate to whom Corral-Alvarez was married in 1998.  See id. ¶ 27, at 8.

Corral-Alvarez purchased condoms.  See id. at 6-7.  Corral-Alvarez then drove to the field.  See id. at 7.  Angela and Corral-Alvarez then exited the vehicle and urinated in the field.  See id.  Angela left her shorts off, and got back into the car only wearing her underwear and a shirt.  See id.  Corral-Alvarez took off all of his clothes.  See id.  Corral-Alvarez and Angela then had sex.  See id.

As to Count I, the Colorado state court granted Corral-Alvarez one deferred sentence with terms and conditions, and $1,725.00 in fees and costs.  See id. at 4-5.  As to Count II, his sentence was deferred until review date for sentence on Count I on November 22, 1999.  See id. at 5.

On February 18, 1999, Immigration and Naturalization Service ("INS") took Corral-Alvarez into custody, and on February 22, 1999, he was deported to Mexico.  See id.  On November 22, 1999, he failed to appear at his review hearing, and a warrant was issued for his arrest.  See id.

Corral-Alvarez reported that, on February 19, 2004, he married Veronica Garcia, age 31, in Aurora, Colorado, with whom he has three children: Ricardo, age 9; Oscar, age 5; and Leonardo, age 2.  See id. ¶ 27, at 8.  On June 6, 2004, he was arrested on the outstanding warrant.  See id. ¶ 22, at 5.

On June 15, 2004, the state court found that, as to Count I, deportation and/or complying with the INS was not a condition of deferred sentence or probation.  See id.  The state court dismissed the Petition to Revoke, and his plea as to Count I was withdrawn.  See id.  The state court dismissed Count I.  See id.  As to Count II, the state court sentenced Corral-Alvarez to one-year probation nunc pro tunc to December 3, 1998.  See id.  The court then found that he had served his sentence.  See id.  On June 16, 2004, the state turned Corral-Alvarez over to Bureau of Immigration and Customs Enforcement ("BICE"), and on June 22, 2004, he was removed to Mexico.  See id.

On July 13, 2004, a United States Border Patrol agent of the Lordsburg, New Mexico Border

Patrol Station encountered eighteen individuals on New Mexico Highway 9 near Lordsburg, New Mexico. See id. ¶ 4, at 2. All eighteen individuals freely admitted to being Mexican citizens illegally in the United States, all who had crossed the United States/Mexico border at a place not designated by the appropriate authority as a port of entry. See id. Upon arrival at Lordsburg Border Patrol Station, all subjects were entered into the ENFORCE/IDENT biometric system where it was found that Corral-Alvarez had been previously deported three times. See id. ¶ 5, at 2. It was also learned of Corral-Alvarez' 1998 conviction for felony sexual assault on a child. See id.

Corral-Alvarez' wife is currently unemployed and is financially supporting the family by selling Corral-Alvarez' tools. See id. ¶ 27, at 8.

He reported one asset: a 1992 Nissan Pathfinder, which he values at $3,000.00.[3] See id. ¶ 36, at 9. He reported no debts. See id.

Corral-Alvarez was ordered detained by the BICE. See id. at 1. Because of this detainer, it is likely that Corral-Alvarez will be deported upon his release.

## PROCEDURAL BACKGROUND

On October 27, 2004, Corral-Alvarez pled guilty, pursuant to a plea agreement, to a one count information charging Reentry of Deported Alien Previously Convicted of an Aggravated Felony, in violation of 8 U.S.C. §§ 1326(a)(1) and (2) and 8 U.S.C. § 1326(b)(2). See Plea Agreement ¶ 3, at 2 (dated October 27, 2004). After Corral-Alvarez pled guilty, a probation officer prepared the PSR. In his Acceptance of Responsibility, Corral-Alvarez admits that, on July 13, 2004, he returned to the United States to help his family. See PSR ¶ 10, at 3. Probation notes the base

---

[3] At the sentencing hearing, however, Corral-Alvarez represented to the Court that his wife has sold the Pathfinder. See Transcript of Hearing 6:8-12.

offense level is eight.  See id. ¶ 12, at 8.

The problem for Corral-Alvarez is the Specific Offense Characteristic.  According to § 2L1.2(b)(1)(A), if the defendant was deported or unlawfully remained in the United States after a conviction for a felony that is a crime of violence, the offense level increases by sixteen levels.  The defendant was deported  following the felony conviction for sexual assault on a child.  See PSR ¶ 13, at 3; id. ¶ 22, at 4-5.[4]  A sixteen-level increase therefore applies.  Corral-Alvarez' adjusted offense level is 21.  He is in criminal history category I.[5]

The guidelines call for a thirty-seven to forty-six month sentence and a fine of $7,500.00 to $75,000.00.  The probation officer identified no departure issues.  See id. at ¶ 39, at 10.  On February 8, 2005, Corral-Alvarez, through counsel, submitted a sentencing memorandum.  See Defendant's Sentencing Memorandum, filed February 8, 2005 (Doc. 19).  Corral-Alvarez moves the Court for a sentence lower than that the PSR recommended and to impose a sentence below the recommended guideline range.  The United States has responded and asks the Court to deny Corral-Alvarez' motion for a sentence below the guideline range.  The United States asks the Court to sentence him consistent with the findings set forth in the PSR.

## UNITED STATES v. BOOKER AND 18 U.S.C. § 3553(a)

Corral-Alvarez cites to United States v. Booker, 543 U.S. __, 125 S.Ct. 738 (2005).  In United States v. Booker, the Supreme Court of the United States held that its decision in Blakely v. Washington, 542 U.S. ___, 124 S.Ct. 2531 (2004), applied to the federal Sentencing Guidelines.  See

---

[4] At the sentencing hearing, Corral-Alvarez did not challenge that a felony conviction for sexual assault on a child is a crime of violence.  See Transcript of Hearing 3:10 - 4:12.

[5] Corral-Alvarez did not dispute that Probation correctly calculated his based offense level and his criminal history category.  See Transcript of Hearing at 4:3-8.

United States v. Booker, 125 S.Ct. at 749 ("[T]here is no distinction of constitutional significance between the Federal Sentencing Guidelines and the Washington procedures at issue in [Blakely].");
id. at 755 ("[O]ur holding in Blakely applies to the Sentencing Guidelines.").  Consequently,  the Supreme Court held unconstitutional two provisions of the federal sentencing statute that made the U.S.S.G. binding and mandatory on district courts assessing sentences, and held that they must be excised from the statute.  See id. at 756-57, 764-65.  Specifically, the Supreme Court excised 18 U.S.C. § 3553(b)(1), which made the Guidelines mandatory, and 18 U.S.C. § 3742(e), which set the standard of review of sentences on appeal, including the provision for de novo review of departures from the Guidelines.  See United States v. Booker, 125 S.Ct. at 756-57, 764-65.  The result is that the Guidelines remain in effect, but are advisory, not mandatory, and courts of appeal must review sentences for "unreasonableness."  Id. at 757, 765-67, 769.

The Supreme Court left intact all other provisions of the Sentencing Reform Act, including 18 U.S.C. § 3553(a).  See United States v. Booker, 125 S.Ct. at 757, 764-65.  Section 3553(a) provides:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider--
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for--

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement--

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C § 3553(a)(1)-(7).

The Supreme Court in United States v. Booker noted that guideline calculations under the Guidelines were one of the factors that a sentencing court must consider under 18 U.S.C. § 3553(a) and that the sentencing court should take all those factors into account in fashioning a sentence within the statutorily provided sentence range.  See United States v. Booker, 125 S.Ct. at 767.  Section 3553(a) continues to require sentencing judges to take certain factors into account when imposing a sentence, including "the kinds of sentence and the sentencing range established" by the Guidelines. 18 U.S.C. § 3553(a)(4).  The Supreme Court preserved "Congress' basic goal in passing the Sentencing Act [which] was to move the sentencing system in the direction of increased uniformity." United States v. Booker, 125 S.Ct. at 761.  Sentencing systems that operate solely upon the principle of unguided discretion lack uniformity and accountability.  See Blakely v. Washington, 124 S.Ct. at 2544-45 (O'Connor, J., dissenting).

Moreover, Section 3553(c) of the Sentencing Reform Act, which was amended in 2003 to place limitations on departures from the Guidelines, also remains intact.  The Sentencing Reform Act still requires sentencing judges to state in writing their reasons for departing from the Guidelines:

> The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence--
>
> * * * *
>
> (2) . . . is outside the range, described in subsection (a)(4), the specific reason for the imposition of a sentence different from that described, which reasons must also be stated with specificity in the written order of judgment and commitment . . . .

18 U.S.C. § 3553(c)(2).

Taking into account this provision of 18 U.S.C. § 3553, a reasonable sentence under United

States v. Booker is one that "reflect[s] the seriousness of the offense, promote[s] respect for the law, provide[s] just punishment, afford[s] adequate deterrence, protect[s] the public, and effectively provide[s] the defendant with needed educational or vocational training and medical care." United States v. Booker, 125 S.Ct. at 765 (citing 18 U.S.C. § 3553(a)(2)).  A reasonable sentence is also one that takes into account "the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." United States v. Booker, 125 S.Ct. at 764-65 (citing 18 U.S.C. §§ 3553(a)(1), (3), (5)-(7)). See 18. U.S.C. § 3553(a)(6)(directing the court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").  Moreover, under United States  v. Booker, the Guidelines form a useful starting point for the sentencing court's determinations, and the Supreme Court has required the sentencing court to consider the Guidelines along with the other factors under § 3553(a). See United States v. Booker, 125 S.Ct. at 767. Over the last sixteen years, the Sentencing Commission has promulgated and honed the Guidelines to achieve these congressional purposes.  Thus, a reasonable sentence often, and perhaps most often, will be one that is within the appropriate guideline range.

For concepts like "just punishment" and "promot[ing] respect for the law" to have meaning under § 3553(a), a court must "consider society's views as to appropriate penalties, not just a judge's own personal instincts." United States v. Wilson, 350 F. Supp. 2d 910, 917 (D. Utah 2005).

> The Guidelines were, after all, created through a democratic process.  The public's elected representatives--Congress--created the Commission, approved the Guidelines, and then adjusted them over the years in an on-going dialog with the Commission. In light of these facts, it should be generally presumed that the Guidelines reflect the public's views on appropriate punishment.

Id. at 918.  "Just punishment" also encompasses the concept of similarly situated defendants receiving

similar sentences.  Id. at 917.  "If 'just punishment' meant nothing more than what a single judge thought was just punishment, then such uniformity of penalties would be impossible."  Id.

United States v. Booker also requires courts, when passing sentence, to take into account "adequate deterrence" under § 3553(a)(2)(B), a concept which relates not only to the defendant being sentenced, but extends to deterring other potential criminals from carrying out similar crimes.  United States v. Wilson, 350 F. Supp. at 918-19.  Here again, individual judges "would be hard pressed to give more than an educated estimate of the general harms imposed by a class of crimes[,]" id. at 920, whereas the Sentencing Commission is well-placed to make such assessments, see id. at 921 (quoting United States v. Booker, 125 S.Ct. at 767 ("[T]he Sentencing Commission remains in place, writing Guidelines, collecting information about actual district court sentencing decisions, undertaking research, and revising the Guidelines accordingly.")).

Indeed, "[t]he only way of avoiding gross disparities in sentencing from judge-to-judge and district-to-district is for sentencing courts to apply some uniform measure in all cases."  Id. at 924. And "the fundamental fact" is "that the Guidelines are the *only* standard available to all judges around the country today."  Id. at 925.  In exercising its discretion in imposing sentences, therefore, the Court should "give heavy weight to the recommended Guidelines sentence" in fashioning a final sentence and "only deviate from those Guidelines in unusual cases for clearly identified and persuasive reasons."  Id.  Even after United States v. Booker, "[i]n all but the most unusual cases, the appropriate sentence will be the Guidelines sentence."  United States v. Wilson, 350 F. Supp. at 914.

## ANALYSIS

The maximum sentence for the crimes to which Corral-Alvarez has pled guilty is 20 years imprisonment, $250,000.00 fine, a three year term of supervised release, and a $100.00 special

penalty assessment.  See PSR at 9.  The crime is a Class C Felony.  See id. at 1.  Corral-Alvarez has

been in continuous custody since the date of his arrest.  See id.

Corral-Alvarez argues that the Court should impose a sentence below the guideline range

because his family relies on him for financial support and his incarceration would cause hardship on

them.  While Corral-Alvarez has not expressly asked the Court for a downward departure within the

Guidelines, his argument is analogous to a request for one.[6]  The Court will therefore first discuss the

situation in terms of a Sentencing Guideline analysis.  The Court will then go on to discuss the

application of the other § 3553(a) factors.

The Court will impose a sentence consistent with the recommended Sentencing Guidelines

range.  The Court, after considering all the factors that Corral-Alvarez raises in his motion, believes

that a guideline sentence is appropriate.

## I.       ANALYSIS UNDER THE UNITED STATES SENTENCING GUIDELINES.

An employment record and family ties and responsibilities, such as those Corral-Alvarez cites

in his motion, are not ordinarily relevant in determining whether a departure from the Guidelines is

warranted.  See U.S.S.G. §§ 5H1.5, -1.6.  "[W]hen a factor is discouraged because it is not

'ordinarily relevant,' . . . 'the court should depart only if the factor is present to an exceptional degree

or in some other way makes the case different from the ordinary case where the factor is present.'"

United States v. Archuleta, 128 F.3d 1446, 1449 (10th Cir. 1997)(quoting Koon v. United States,

518 U.S. 81, 96 (1996)).  The court must therefore consider "whether the record . . . establishes

family circumstances so exceptional that they constitute the rare case justifying a departure from the

_____

[6] Indeed, at this sentencing, Corral-Alvarez stated that he was not asking for a downward departure, but only a deviation from the Guidelines.  See Transcript of Hearing at 3:22 - 4:7.

Guidelines which already recognize the reality of difficult family circumstances for many defendants and which discourage making an additional allowance on that basis." Id. at 1452.

The policy statement to U.S.S.G. § 5K2.0 -- the provision of the Guidelines governing departures -- provides:

> Because certain circumstances are specified in the guidelines as not ordinarily relevant to sentencing . . . , a departure based on any one of such circumstances should occur only in exceptional cases, and only if the circumstance is present in the case to an exceptional degree.  If two or more of such circumstances each is present in the case to a substantial degree, however, and taken together make the case an exceptional one, the court may consider whether a departure would be warranted . . . .  Departures based on a combination of not ordinarily relevant circumstances that are present to a substantial degree should occur extremely rarely and only in exceptional cases.

U.S.S.G. § 5K2.0, cmt n.3(C).

The commentary and application note give the court guidance on the applicability of U.S.S.G. § 5H1.6.  The court must ground a departure based on a family's loss of caretaker or financial support on the following considerations:

1.    Circumstances to Consider.--

    (A)    In General.--In determining whether a departure is warranted under this policy statement, the court shall consider the following non-exhaustive list of circumstances:

        (i)    The seriousness of the offense.

        (ii)    The involvement in the offense, if any, of members of the defendant's family.

        (iii)    The danger, if any, to members of the defendant's family as a result of the offense.

    (B)    Departures Based on Loss of Caretaking or Financial Support.--A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires, in addition to

the court's consideration of the non-exhaustive list of circumstances in subdivision (A), the presence of the following circumstances:

(i)     The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii)    The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

(iii)   The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

(iv)    The departure effectively will address the loss of caretaking or financial support.

U.S.S.G. § 5H1.6 cmt. n.1.  Corral-Alvarez contends that he has a viable claim for downward departure under this section.

Corral-Alvarez contends that an analysis of the "non-exhaustive list of factors" provided in the commentary to § 5H1.6 suggests that Corral-Alvarez' offense in this case is not a relatively serious offense, his family was not involved, and no family member was placed in danger as a result of the offense.  Moreover, Corral-Alvarez contends that, under the circumstances listed in the commentary on "[d]epartures [b]ased on [l]oss of [c]aretaking or [f]inancial support[,]" the recommended sentence of thirty-seven to forty-six months will have a direct and specific loss of essential financial support to his family.  Corral-Alvarez also alleges that the impact on his family is

-14-

significantly and substantially greater than a similarly situated defendant.  Corral-Alvarez contends his situation is unique in that he has been the sole financial breadwinner in the family since he and his wife married.  See Defendant's Sentencing Memorandum at 4.  She has no employable skills and is the children's caretaker.  See id.

Corral-Alvarez' wife has sold most of their personal belongings and has moved to Mexico. See Transcript of Hearing at 6:8-15.  In a country that is economically impoverished in comparison to the United States and has more workers than jobs that pay comparably to wages in the United States, ameliorative and remedial programs are few.  Corral-Alvarez contends that Mexican families often are traditional in that spouses assume delineated roles of child nurturer and breadwinner respectively.  Corral-Alvarez' role as breadwinner will be difficult to replace.  Corral-Alvarez alleges that a departure under this section would effectively address the loss of financial support.  Corral-Alvarez argues that, the sooner the United States releases him from custody, the sooner the INS will remove him to Mexico and he will be reunited with his family.  Moreover, Corral-Alvarez mentions that such a reunion decreases the likelihood of his return.

The problem with Alvarez' motion, however, is that the loss of caretaking or financial support in Corral-Alvarez' case does not exceed the harm that the Court ordinarily observes incident to incarceration of similarly situated defendants.  Moreover, the loss of financial support and caretaking, while it will be difficult, is not irreplaceable.  A departure on this basis, unless the Court declined to sentence him to any time in incarceration, would not address loss of financial and caretaking support.

The Court is also mindful that Corral-Alvarez' socio-economic status is ordinarily not relevant to the Court's sentencing calculation under the Guidelines.  Based on the evidence before the Court, there is nothing suggesting that Corral-Alvarez' situation is unusual or exceptional to warrant a

downward departure on this basis.  Moreover, pursuant to U.S.S.G. § 5K2.0 (Grounds for Departure), the probation officer finds that, based on the information available, there does not exist an aggravating or mitigating circumstance of a kind, or to a degree, that  the Sentencing Commission did not adequately take into consideration in formulating the Guidelines which should result in a sentence different from the guideline sentencing.  The Court therefore finds that the facts and circumstances of this case do not warrant a downward departure.

II.     **FACTORS UNDER 18 U.S.C. § 3553(a).**

To the extent the Corral-Alvarez seeks a deviation or a variation from the guideline calculation,[7] the Court will also analyze whether the proscribed sentence under the Guidelines is reasonable in light of the factors under 18 U.S.C. § 3553(a).

A.     **THE NATURE AND CIRCUMSTANCES OF THE OFFENSE.**

Corral-Alvarez contends that he committed this offense for reasons noble in spirit.  Under most circumstances, society lauds a person for rising to his family's aid.  Corral-Alvarez' offense involved no weapons, violence, or controlled substance.  Corral-Alvarez' motivation for the crime was apparently a desire to reunite and come to the aid of his family.  Also, once apprehended, Corral-Alvarez, along with others, cooperated with border patrol agents and freely admitted to being Mexican citizens illegally in the United States.  See PSR ¶ 4, at 2.

Corral-Alvarez' offense is not significantly different from the many re-entry cases that this Court sees in this District.  If the Court were to immediately release all similarly situated defendants,

_____

[7] At the hearing, Corral-Alvarez' counsel, Keith Romero, represented that Corral-Alvarez was seeking a deviation from the Guidelines sentence, with the downward departure analysis one of the considerations that the Court should take into account under United States v. Booker.  See Transcript of Hearing 3:15 - 4:1.

-16-

there would be little punishment for this offense.  Corral-Alvarez has re-entered the United States several times.  A twenty-one offense level is a Class C felony.  While this offense is not the most serious offense, Congress and the Commission also do not consider this crime one that does not need to be punished.  The Court does not believe this factor counsels a deviation or variation from the Guidelines sentence.

### B.       CORRAL-ALVAREZ' HISTORY AND CHARACTERISTICS.

During his stay in the United States, Corral-Alvarez contends that he has been gainfully employed.  Corral-Alvarez alleges that he was a business owner while living in Aurora, Colorado.  Accordingly, Corral-Alvarez objects to one of PSR's paragraphs describing Corral-Alvarez' employment.  See PSR's Offender Characteristics, Employment ¶ 32, at 8.  Paragraph 32 states: "The defendant reported that from 1997 to 2002, he was employed as a construction framer in Littleto[]n, Colorado.  He reportedly earned $18 per hour."  Corral-Alvarez contends that, contrary to the PSR, from 1997 to 2002, he owned and operated Corral Construction, whose primary business was as sub-contractor for various construction projects.  Corral-Alvarez mentions that he employed up to six employees at any one time and paid both state and federal taxes.  Alvarez argues that, rather than taking employment and channeling money back into his native Mexico economy, Corral-Alvarez generated jobs here and paid taxes like other business owners.

Corral-Alvarez' history, however, raises two issues.  First, he was deported in June of 1999 and again in June of 2004.  Again, each time, his reason for returning was to reunite with his wife and children, and to support them financially.  The obvious assumption is that Corral-Alvarez displays a propensity to continue re-entering the United States illegally.  Given the motive to reunite with and to support his family, this propensity may be decreased now that his wife and children have moved

back to Mexico, awaiting his return upon completion of his sentence.  But there is no assurance that all will not return to the United States after this family crisis subsides.

Second, Corral-Alvarez' criminal history reveals a conviction for the serious crime of sexual assault on a minor while in Colorado, thereby making him dangerous.  Corral-Alvarez does not object to the synopsis of his statement in the PSR.  See Defendant's Sentencing Memorandum at 6.  Corral-Alvarez maintains, however, that it was a consensual encounter, albeit illegal.  He admitted then, as he does now to the Court, that he exercised extremely poor judgment and broke the law.

Corral-Alvarez' counsel, however, "submits to the Court that the legal boundaries and mores regarding consensual sex between partners who vary in age, vary greatly country to country."  Id. Corral-Alvarez contends that this variation may be particularly so in countries steeped in more traditional gender roles.  Corral-Alvarez asserts that this variation in mores is often the case in Mexico, particularly in rural areas.  Corral-Alvarez argues that it is not unheard of in Mexico for a teenage girl to be involved with or to wed an older man.  Corral-Alvarez contends that, while what he and other older Mexican men do with young girls might offend American sensibilities, the cultural differences provide some context to the consensual encounter between him and the young woman mentioned in the PSR's Part B, Defendant's Criminal History.

The problem with Alvarez' argument is that it is not as important what the mores in Mexico are as is the law where the crime of violence was committed.  More important, Colorado -- the state in which Corral-Alvarez was residing at the time he committed the aggravated felony -- considers his sexual conduct with a twelve-year old girl a serious offense.  Because United States' law considers what Corral-Alvarez did to be a serious crime, his history does not counsel a deviation from the Guidelines.

-18-

C.   **THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE.**

In this age of post 9/11 concern over terrorism, it is understandable that the United States is diligent in securing its borders and monitoring those who come in and out of the country.  The 2000 mile border with Mexico, however, has presented a particular problem since the mid-1800's.  Crime, and drugs in particular, have long been a reality around the border.

Another economic reality, however, is that citizens south of the border have long been an elastic labor supply for jobs in the United States that United States citizens were unwilling to perform at certain wage levels.  Those drawn across the border for the primary reason of working are the products of the supply and demand for labor between two economically disproportionate countries.

In the spectrum of crimes that come before the Court, the Court cannot say that most illegal entry crimes are at the most serious end of the range.  They often are more a function of economics. Nonetheless, these crimes -- particularly when the defendant repeats the offense several times -- show a disrespect for the law.

Corral-Alvarez contends that, in addition to the economic aspects of his crime, the desire to reunite with his wife and children drove him to commit his offense.  Again, however, Corral-Alvarez did not remedy his situation before committing the offense for which he now stands before the Court. His unwillingness to order his family life and instead come back into the United States shows disrespect for the United States' immigration laws.

Corral-Alvarez is basically asking this unelected Court to make a value judgment about the nation's immigration laws with its sentence in this case.  That the Court will decline to do.  Congress has passed the law and, with its considerable funding, intends that it be enforced.  The Court is not

free to ignore the law.  The seriousness of the crime, the respect for law, and the need to provide just

punishment for the offense do not provide reasons to deviate or vary from a Guidelines sentence.

    **D.**      **THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES.**

One of the factors set forth in 18 U.S.C. § 3553(a)(2)(B) that the Court must evaluate is the

problem of unwarranted sentence disparities among defendants with similar records with similar

records who have been found guilty of similar conduct.  This evaluation requires an inquiry similar

to that the Court undertook in deciding whether to grant a downward departure.

One of the situations that New Mexico District Court Judges encounter frequently is an illegal

alien with a prior aggravated felony who unlawfully re-enters the United States for economic reasons

or to reunite with family.  The Sentencing Commission is aware of this situation, and it continues to

promulgate and hone the Guidelines to achieve the congressional purposes of uniformity and

accountability.  For the illegal re-entry of an alien convicted of an aggravated felony, therefore, the

most reasonable sentence will most often be one within the proscribed Guidelines range.  For the

Court to pick out one every so often and deviate from the Guidelines sentence would be to introduce

unwarranted sentencing disparities.  Given the large number of similar cases that the Court sees in

this District, the Court does not believe this factor counsels in favor of a deviation or variation.

    **E.**      **THE NEED FOR THE SENTENCE IMPOSED TO AFFORD ADEQUATE
DETERRENCE TO CRIMINAL CONDUCT.**

Before this incident, Corral-Alvarez had not spent a significant amount of time incarcerated.

To date, however, Corral-Alvarez has been in continuous custody since the date of the incident at

issue here --  approximately seven months at the time of the sentencing in February, 2005.  Corral-

Alvarez' counsel submits that this incarceration time has served as more than sufficient deterrent to

Corral-Alvarez to not return to the United States.  Once again, Corral-Alvarez notes that the fact that his family has moved back to Mexico greatly decreases this likelihood.

While Corral-Alvarez' criminal history is not as threatening as others that appear before the Court, he also is not someone who has come to this country and been totally law abiding.  Corral-Alvarez has spent some time in jail, yet he continues to break local and federal laws in this country. The Court cannot say that this factor supports Corral-Alvarez' request that the Court deviate or vary from the Guidelines.  Moreover, the Sentencing Commission -- and not the Court -- is in a superior position to make assessments about the deterrent effects of proscribed sentences.

F. **THE NEED FOR THE SENTENCE IMPOSED TO PROTECT THE PUBLIC FROM FURTHER CRIMES BY CORRAL-ALVAREZ.**

Corral-Alvarez' counsel submits that his minimal criminal history does not suggest a likelihood of recidivism.  Moreover, Corral-Alvarez contends that the time he has already spent in jail and his intention to once again reunite with his family permanently in Mexico provides sufficient assurances that he presents no further threat to society.  Corral-Alvarez argues that it burdens society economically to further house and incarcerate a defendant with his circumstances and characteristics.

It is too speculative, however, to conclude that, because his family has returned to Mexico, Corral-Alvarez no longer poses a threat of breaking the laws of the United States in the future. Indeed, that he has multiple violations of federal immigration laws suggests that he may commit future crimes.  In any case, the Court declines to deviate from the Guidelines on this basis.

G. **THE NEED FOR THE SENTENCE IMPOSED TO PROVIDE THE DEFENDANT WITH NEEDED EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER.**

Congress has provided additional guidance on this factor in its instructions to the Sentencing

-21-

Commission, wherein it points out "the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed educational or vocational training, medical care, or other correctional treatment." 28 U.S.C. § 994(k). Corral-Alvarez' counsel submits that Congress considered this factor in light of a defendant who is going to one day have to function and contribute in our society.[8]

In this case, these considerations militate against a sentence to imprisonment. It is Corral-Alvarez' intent to return to his native country. The INS will deport him. There does not appear to be any fairness to United States taxpayers to fund any training and education to a defendant for whom they will not reap direct benefit from the fruits of his training and education.

But as Corral-Alvarez points out, deterrence of his return is key in this case. He contends the current time he has served on this case has satisfied deterrence. As the Court has already stated, however, Corral-Alvarez is not new to the criminal justice system, and these experiences have not deterred him yet from violation of United States law. This fact outweighs this final factor in the analysis.

## H.     CONCLUSION.

Corral-Alvarez will have been in jail for approximately seven months as of February, 2005. The Court cannot say, however, that the interests of the United States, of the citizenry, and of Corral-Alvarez would be best served by sentencing him to incarceration equivalent to the time he has already served rather than a sentence of further incarceration. While Corral-Alvarez suggests that the limited beds in the federal prison system are needed for far more serious offenders than a defendant

---

[8] According to Probation, illegal aliens are entitled to participate in educational and vocational programs while incarcerated. Illegal aliens are not, however, eligible for the 500-hour drug program.

motivated by financial and family concerns, Congress has not indicated that the federal courts along the border should cease incarcerating illegal aliens who come to the United States for work. Balancing all the factors expressed in § 3553(a), the Court does not believe that they counsel that the Court should deviate or vary from the Guidelines sentence.

**IT IS ORDERED** that Defendant Ricardo Corral-Alvarez' request for a downward departure under the Guidelines and his request to deviate from the Sentencing Guidelines are denied and, accordingly, Corral-Alvarez will be sentenced pursuant to the guideline range of thirty-seven to forty-six months.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Iglesias
   United States Attorney for the
    District of New Mexico
Norman Cairns
   Assistant United States Attorney
Office of the United States Attorney for the
   District of New Mexico
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Keith R. Romero
Albuquerque, New Mexico

      *Attorney for the Defendant*